## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| LINDA BRADFORD, Individually and as Special Administrator of the Estate of DEVELT BRADFORD, deceased,<br><br>       *Plaintiffs*,<br><br>     v.<br><br>CITY OF CHICAGO, a Municipal Corporation, CHICAGO POLICE OFFICER PHYLLIS GILL, CHICAGO POLICE OFFICER JOHN OTTO, and DETENTION AIDE DARRIN WEST,<br><br>       *Defendants*. | No. 16 CV 1663<br><br>Judge Thomas M. Durkin |

### MEMORANDUM OPINION AND ORDER

In this case concerning the suicide of Develt Bradford ("Bradford") while in the custody of the City of Chicago (the "City"), Plaintiffs are Bradford's widow Linda Bradford, both individually and as special administrator of Bradford's estate. Defendants are the City, Chicago police officers Phyllis Gill and John Otto, and detention aide Darrin West (Gill, Otto, and West together, "the Individual Defendants," and the City and the Individual Defendants together, "Defendants"). Plaintiffs allege that Defendants are liable for Bradford's suicide. Defendants have moved for summary judgment. R. 198. For the following reasons, their motion is granted.

## Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court considers the entire evidentiary record and must view all of the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health and Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). Ultimately, summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## Local Rule 56.1

Local Rule 56.1 requires parties moving for summary judgment to submit in support of their motion a statement of material facts comprised of short numbered paragraphs with citations to admissible evidence. L.R. 56.1(a)(3). The nonmovant then must respond with particularity, providing citations to "specific references to the affidavits, parts of the record, and other supporting materials relied upon" in the case of any disagreement. L.R. 56.1(b)(3)(B). The nonmovant also may submit a statement of additional facts, the obligations for which are "identical to the obligations imposed on the movant's statement of facts." *Malec v. Sanford*, 191 F.R.D. 581, 584 (N.D. Ill.

2000); L.R. 56.1(b)(3)(C). If the nonmovant fails to controvert the movant's facts in the manner proscribed, the facts are deemed admitted. L.R. 56.1(b)(3)(C); *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003). Indeed, the Court is "entitled to expect strict compliance" with Local Rule 56.1, *Cichon v. Exelon Generation Co. LLC*, 401 F.3d 803, 809-10 (7th Cir. 2005), particularly where, as here, the parties are represented by counsel, *Pytell v. Bradley*, 2010 WL 5110138, at *2 (N.D. Ill. Dec. 7, 2010) ("Strict compliance with Local Rule 56.1 is required even of pro se litigants. Pytell, who is represented by counsel, appears to have no excuse for failing to comply with the rules.") (internal citations omitted).

Those rules notwithstanding, a significant portion of Plaintiffs' response to Defendants' Local Rule 56.1 statement is improper because it contains argument, incorrect characterization of the evidence and/or speculation, denials without proper citation to the record, and factual allegations beyond those set forth in the paragraph to which Plaintiffs were responding. *See, e.g.*, R. 221 ¶¶ 3-4, 7-8, 10-12, 14-23, 25, 27-29, 31, 33-34, 36-37, 45-47, 61, and 70. And Plaintiffs' statement of additional facts suffers from many of the same issues. *See, e.g.*, R. 217 ¶¶ 3-6, 8-10, 12-19, 21-26, 29-35. 29-34.[1] Plaintiffs' legal conclusions, speculation, unsupported or argumentative denials and mischaracterization of the evidence are ignored. *See Campbell v. City of Chicago*, 2018 WL 4637377, at *1 (N.D. Ill. Sep. 27, 2018) ("Purely argumentative

---

[1] Plaintiff's Rule 56.1 statement of additional facts contains paragraphs numbered successively as follows: 1-21, 26-38, and 22. For purposes of clarification, the Court's references to those paragraphs are renumbered as Defendants' responses to them are; that is, from 1-35. *See* R. 224.

denials, legal conclusions, and unsupported general denials do not belong in Local Rule 56.1 Statements."); *De v. City of Chicago*, 912 F. Supp. 2d 709, 714 (N.D. Ill. 2012) ("Speculative assertions are improper under Local Rule 56.1."); *Taylor v. Cook Cty. Sheriff's Off.*, 442 F. Supp. 3d 1031, 1041 (N.D. Ill. 2020) (Local Rule 56.1 statements that mischaracterize the evidence violate that rule). The same is true for the additional facts Plaintiffs submitted through their response. *Cichon*, 401 F.3d at 809-10 (affirming district court decision to ignore additional facts submitted in response to movant's 56.1 statement). Further, Plaintiffs' "factual allegations not properly supported by citation to the record are nullities." *Malec*, 191 F.R.D. at 583 ("citations must include page (or paragraph) numbers, as opposed to simply citing an entire deposition, affidavit, or other exhibit document").[2]

On the other hand, each of Defendants' statements of fact are properly supported. The Court thus credits Defendants' version of the facts to the extent not properly disputed in Plaintiff's responses or by Plaintiffs' own Local Rule 56.1 statement of additional facts and evidentiary materials, and deems the offending portions of Plaintiffs' responses to be admissions. *Campbell*, 2018 WL 4637377 at *1; *Aberman v. Bd. of Educ. of Chicago*, 242 F. Supp. 3d 672, 677 (N.D. Ill. 2017). The Court turns to the facts set forth and properly supported by the parties' submissions in accordance with Local Rule 56.1, which come primarily from Defendants' filings.

---

[2] Plaintiffs also cite to the operative complaint and to prior pleadings as evidence. *See id.* ¶¶ 20, 21, 34, 35. But "mere allegations of a complaint are not evidence." *Tibbs v. City of Chicago*, 469 F.3d 661, 663 n.2 (7th Cir. 2006). And prior pleadings are of no legal effect. *See 188 LLC v. Trinity Indus., Inc.,* 300 F.3d 730, 736 (7th Cir. 2002) (an amended pleading makes the prior pleading "functus officio").

*Waldridge v. Am. Hoescht Corp.,* 24 F.3d 918, 922 (7th Cir. 1994) ("[D]istrict courts are not obliged . . . to scour the record looking for factual disputes.").

## Background

Defendant Detective John Otto and non-party Detective Richard Sullivan arrested Bradford without a warrant at his home early in the morning on November 15, 2011 based on information linking him to a recent armed robbery and murder.[3] Bradford was wearing pajamas at the time, but was given clothing, including his sweatshirt, pants, and jacket. Bradford, who had been arrested ten times before that on primarily drug-related charges, waived his *Miranda* rights and provided the detectives with information regarding the alleged shooter. The detectives then drove Bradford to the District 5 Police Station at 727 East 111th Street in Chicago and brought him to Area 2 for questioning.

At approximately 2:48 a.m., Bradford was placed in Interview Room 2 at Area 2. Interview Room 2 contains an Electronic Recording of Interview ("ERI") switch, which was activated and recorded the audio and video of Detective Otto's interview

---

[3] Plaintiffs offer the June 15, 2020 affidavit of Bradford's sister, Diane Bradford Hyman, who lived in the same building as Bradford and was present when Bradford was arrested. R 219, Ex. 3. In that affidavit, Ms. Hyman states among other things that she "overheard the officers who came into the house scream 'yeah, we have that N—er now.'" R. 219, Ex. 3 ¶ 6. Defendants argue that this affidavit contradicts Ms. Hyman's October 17, 2014 deposition testimony, in which Ms. Hyman recounted her conversations with the officers and the statements she heard them make, none of which statements were similar to that alleged in her affidavit. *See generally* R. 224, Ex. AA; *McCann v. Iroquois Mem'l Hosp.,* 622 F.3d 745, 750-51 (7th Cir. 2010) ("a plaintiff cannot manufacture an issue of fact by submitting an affidavit that contradicts prior sworn testimony"). The Court agrees, but notes that this statement is not relevant to the claims in the case.

with Bradford a few minutes later. Detective Otto read Bradford his *Miranda* rights and began to discuss the shooting and robbery in question. Shortly thereafter, Bradford asked to speak to a lawyer. Detective Otto ended the interview and left the room. Around 4:20 a.m., Detectives Otto and Sullivan removed Bradford from the interview room for processing and to complete his arrest report. Bradford was continuously recorded by the ERI until that point.

Bradford was taken to the District 5 lockup around 7:00 a.m. Lockup personnel noted during Bradford's intake that he did not appear despondent or irrational, and that he indicated when asked that he had not attempted suicide or serious harm before, and had no serious medical or mental problems. Like Interview Room 2, the lockup contained video cameras, but they were inoperable, as they had been for years.

Bradford was removed from lockup and taken back to Area 2 for lineups from approximately 8:00 a.m. to 10:00 a.m. on November 16, 2011, before being returned to Interview Room 2, where he was once again recorded by the ERI. Around 11:16 a.m., Bradford indicated that he wanted to talk. He was then questioned by non-parties Detective Alfini and his partner after waiving his *Miranda* rights. During this interview, Bradford supplied more information regarding his role in the robbery and shooting, and regarding the alleged shooter. Before concluding the interview, Detective Alfini and his partner asked Bradford "Are you ok?" Bradford responded "hell no, I ain't." Detective Alfini then said "You know what I mean. For the circumstances we're in." Bradford raised his hands palms up in response, shook his head, and said "yeah." Detective Alfini asked Bradford if he needed anything to eat,

offered to heat up the food that he had been eating, lit Bradford's cigarette, and promised (at Bradford's request) to look for some better cigarettes for him.

Bradford was interviewed again by different detectives around 7:19 p.m. and 8:01 p.m. that evening regarding other robberies that he was involved in. Both interviews were recorded by the ERI. When speaking to him at 8:01 p.m., the detectives acknowledged that Bradford had "been here for a while" and had "talked to a few different detectives." The detectives then asked Bradford if he was "willing to talk to [them]," and Bradford agreed. He was again read his *Miranda* rights, and thereafter answered their questions.

Bradford did not indicate at any point during any of the recorded interviews that he was in pain or having any medical issues, or that he was contemplating suicide or self-harm. There likewise is no other evidence that he otherwise told jail staff that he was considering self-harm.

Bradford was transported back to lockup at approximately 9:00 p.m., which was the last time Detective Otto saw him. Detective Otto testified that Bradford appeared to be doing fine at the time, and that he never did or said anything to make Otto think that he might commit suicide. Otto went home around 12:30 a.m.

That night, the Cook County Assistant State's Attorney approved first degree murder and robbery charges against Bradford. At some point that evening, Bradford received a court order in his cell indicating that his bond hearing would take place the morning of November 17, which, due to the timing of his arrest and approval of charges, was outside of the usual 48 hours after arrest.

Defendant Detention Aide West worked the lockup the evening of November 16-17, arriving for duty after Bradford had been transported there. Non-party Officer Gregory Jones was also on duty at the lockup that evening. Between them, Jones and West checked Bradford's and the other arrestees' cells every 15 minutes pursuant to City policy and recorded those checks in a logbook. In addition to the 15-minute checks, Jones and West also checked the cells while completing other tasks in the vicinity. Bradford remained calm and quiet throughout that time. None of the checks revealed any observable change in Bradford's demeanor. But at 1:25 a.m. on November 17, 2011, ten minutes after the last logged check, Jones found Bradford suspended by his neck with a pair of pajama pants tied to the bars of his cell.[4] Jones immediately yelled for West, who rushed to help open the cell door, and then worked to cut the pajama pants loose while Jones held Bradford up to create slack. Jones performed chest compressions, and West ran to call the front desk so that staff could notify the watch commander and call an ambulance. West then returned to Jones and Bradford. The paramedics arrived within five minutes, but were unable to revive Bradford, who was pronounced dead at 2:03 a.m.

Defendant Lieutenant Phyllis Gill was working as watch commander that night and was responsible for overseeing the lockup. Prior to his death, Gill saw Bradford once while performing her lockup inspection. She did not get the impression that he would harm himself, and nor had she received information to indicate that he intended to.

---

[4] The record is silent as to how the pajama pants came to be in the cell.

Dr. Ariel Goldschmidt performed an autopsy on Bradford's body at the Cook County Medical Examiner's Office at approximately 9:00 a.m. on November 17, 2011. According to Dr. Goldschmidt's report, Bradford died of a hanging. The report noted no injuries to Bradford's body that were outside of those associated with a hanging, and Dr. Goldschmidt ruled Bradford's death a suicide. A second autopsy requested by Bradford's family also found to a reasonable degree of medical certainty that Bradford's manner of death was suicide, with no contributory causes of death.

In the course of this case, Plaintiffs hired Dennis Waller, a private detective with extensive experience in law enforcement and related training and education, as an expert. Mr. Waller considered Bradford's death a suicide, for which he suggested that Bradford was at a high risk because of the change in his status from suspect to an individual charged with murder, and because he was held "virtually incommunicado for almost 48 hours."

A few days after Bradford's death, another detainee committed suicide by hanging. Lieutenant Gill testified that she had not heard of anyone who died by hanging in the Fifth District before Bradford, and while she had heard that there had been suicides in the past, she was not aware of the specifics. Detention Aide West testified that he was not aware of any successful suicides prior to Bradford's. There is no evidence that Otto was aware of any suicides before Bradford's.

Plaintiffs filed this lawsuit in December 2011 in Illinois state court, alleging state law claims of wrongful death and survival. Plaintiffs amended their complaint several times before adding a Fourth Amendment claim against the Individual

Defendants under 42 U.S.C. § 1983. Defendants then removed the case to federal court. Almost a year later, Plaintiffs sought leave to file the operative complaint, which added a claim against the City under *Monell v. Department of Social Services of the City of New York*, 436 U.S. 658 (1987). This Court granted that motion, and subsequently bifurcated and stayed the *Monell* claim.

In all, the operative complaint sets forth: (1) Illinois state law claims against the Individual Defendants under the Wrongful Death Act, 740 ILCS 180/0.01, *et seq.* (Count I) and Survival Act, 755 ILCS 5/27-6, *et seq.* (Count II); (2) *respondeat superior* and indemnification theories against the City (Counts V and VI, respectively); (4) a Fourth Amendment claim against the Individual Defendants (Count III); and 5) a *Monell* claim against the City (Count IV). R. 44. Defendants move for summary judgment on all counts.

## Analysis

## I. Fourth Amendment (Count III)

In Count III, Plaintiffs assert that the Individual Defendants acted in an objectively unreasonable manner in failing to supervise and prevent Bradford's death while in custody. Claims related to conditions of confinement are governed by different constitutional amendments depending on the individual's status within the criminal justice system. The Fourth Amendment governs where, as here, the individual is under arrest but has not yet received a judicial determination of probable cause. *Lopez v. City of Chicago*, 464 F.3d 711, 719 (7th Cir. 2006).

10

### A.    Liability

The Seventh Circuit distinguishes between claims concerning a failure to provide medical care, and those pertaining to conditions of confinement, but in each case applies the Fourth Amendment's "objectively unreasonable" standard. *See Currie v. Chhabra,* 728 F.3d 626, 629 (7th Cir. 2013). There is some confusion over the theory Plaintiffs assert in this case.[5] But as explained below, Plaintiffs fail to present evidence to support either theory, and the video and other evidence runs contrary to both.

### 1.    Medical care

Courts look to four factors to determine whether an officer's response to an arrestee's medical need—here, suicidal ideations—is objectively unreasonable: (1) notice of the medical need; (2) seriousness of the medical need; (3) nature or scope of the requested treatment; and (4) police interests involved. *Florek v. Vill. of Mundelein, Ill.,* 649 F.3d 594, 600 (7th Cir. 2011). But "officers must receive some form of notice of suicide risk before their failure to prevent an arrestee's suicide can be considered objectively unreasonable." *Buford v. City of Chicago,* 2009 WL 4639747, at *3 (N.D. Ill. Dec. 3, 2009). Indeed, "[o]bjective reasonableness is not . . . measured by whether an officer *should* have had notice of a medical condition, but whether an officer having *actual* notice of an arrestee's medical condition acted reasonably." *Saucedo v. City of Chicago*, 2015 WL 3643417, at *4 (N.D. Ill. June 11, 2015). An officer may receive such notice "by word . . . or through observation of the arrestee's

---

[5] The operative complaint purports to allege a conditions of confinement claim, whereas Plaintiffs' response brief states that Count III concerns medical care.

physical symptoms." *Florek*, 649 F.3d at 600 (quoting *Williams v. Rodriguez*, 509 F.3d 392, 403 (7th Cir. 2007)). Defendants contend that none of the Individual Defendants had notice that Bradford was prone to suicide, so none can be liable. The Court agrees. There is no evidence that Bradford suffered from mental health issues, threatened or engaged in self-harm in the past, or had suicidal ideations prior to his suicide, let alone that any of the Individual Defendants knew that he had. And as explained further below, Plaintiffs cannot side-step this failure of evidence.

**Otto.** Plaintiffs argue that Detective Otto is liable because: (1) he knew Bradford from prior arrests and that he "was on heroin and cocaine," and if he did not, Bradford "made it clear to him during the interrogation on video when he said 'I used my proceeds of the robbery to buy heroin'"; and (2) he was "trained to recognize heroin withdrawal symptoms;" and "knew that Bradford was exhibiting these symptoms." R. 220 at 16. But Plaintiffs fail to substantiate that Otto was aware of Bradford's past or current troubles with illicit substances. And even if he was, Plaintiffs offer nothing but speculation that Bradford was in withdrawal and that Otto knew it. Moreover, Plaintiffs' characterizations of Bradford's "symptoms" are an exaggeration in any case, and no reasonable jury could conclude otherwise. Indeed, Plaintiffs contend that the ERI recordings show Bradford "shivering, sneezing and sweating, all at the same time, pulling tissues out of a box and continuing to wipe his brow," and that he "look[ed] to be in pain" and was "twitching." R. 220 at 7; R. 221 ¶ 8. But the Court's review of the recordings reveals that while Bradford did occasionally use tissues, sneeze, and wipe his brow, there is no visible twitching or

shivering, and nothing to indicate that he was in pain. Even if there were, Plaintiffs cite no authority to indicate that signs of pain or withdrawal are enough to give notice of a suicide risk. And the Court is dubious of such a contention. *See Pulera v. Sarzant*, 2019 WL 2476978, at *5 (E.D. Wis. June 14, 2019), *aff'd*, 966 F.3d 540 (7th Cir. 2020) ("complaints of physical pain and discomfort d[o] not give notice" of "an imminent risk of [self-]harm); *see also Est. of Allen v. Cumberland Cty.*, 2018 WL 6705672, at *3 (D.N.J. Dec. 19, 2018) (that undergoing opiate withdrawal not sufficient to allege a vulnerability to suicide).

Plaintiffs also argue that Otto had notice of Bradford's suicidality because Bradford grew more and more despondent as time went on, began "crying uncontrollably," and "[h]is demeanor . . . move[d] into full depression." R. 220 at 7. First, this assumes that Otto witnessed every instance of behavior (which he denies). And again, Plaintiffs exaggerate the evidence. The ERI recordings reflect that Bradford ate, smoked cigarettes, answered questions about the crimes at issue, expressed regret for having been involved, and otherwise largely sat quietly. That he may have sniffled or cried softly at times or have been upset cannot be surprising, and is not enough to suggest suicidal ideations as opposed to simple frustration or upset about his situation. Courts have concluded that similar minor signs of upset and even knowledge of diagnosed and medically-treated depression do not establish notice of suicidality. *See Pulera v. Sarzant*, 966 F.3d 540, 551 (7th Cir. 2020) (arrestee's "scant comments" to defendant-officer indicating that his mother and brother had recently committed suicide and that he had been prescribed clonazepam

for depression "d[id] not raise an issue of fact" on Fourth Amendment medical care claim); *Matos ex rel. Matos v. O'Sullivan*, 335 F.3d 553, 558 (7th Cir. 2003) ("not every prisoner who shows signs of depression . . . can or should be put on suicide watch"); *Pulera*, 2019 WL 2476978, at *5 ("Pulera gave no indication he was thinking of harming himself to any of the nursing staff he has sued for failing to prevent him from doing so less than forty-eight hours later. They cannot be faulted for failing to read his mind.").[6]

Plaintiffs also attempt to characterize the various officers' behavior toward Bradford as cruel or harsh, ask the Court to speculate about what occurred when Bradford was *not* being recorded, and to assume that Detective Otto witnessed or otherwise was privy to all of it. But even if Otto was always observing Bradford (which, again, he denies), the ERI recordings reflect that the officers remained as Bradford did—calm and relatively collected—speaking to him in a civil manner and thanking him on several occasions for assisting in their investigations.

Moreover, while earlier versions of Plaintiffs' complaint allege that Bradford was tortured while in the City's custody, the operative complaint makes no such claim. *Compare* R. 1-1 (Fifth Amended Complaint) *with* R. 44 (Sixth Amended Complaint). And even if Plaintiffs' torture allegations still were part of this case,

---

[6] The closest Plaintiffs come to offering evidence of suicidality is Bradford's statement in an ERI recording from November 16, 2011 that "my life is done." But that statement was made to Detective *Alfini* in passing while lighting Bradford's cigarette and responding to Bradford's question about how charges are determined, not during any interview, and there is no evidence that Otto was listening in or watching at the time.

Plaintiffs' "evidence" fails to support them. First, Plaintiffs rely upon allegations concerning police conduct occurring at the same police station in *1986*. *See* R. 217 ¶¶ 3-4. Plaintiffs make no effort to demonstrate—nor do they contend—that any of the Individual Defendants were involved in that conduct or otherwise connect that conduct to this case.

Plaintiffs also rely upon the June 11, 2020 affidavit of Bradford's nephew, Edwin Butler, who was questioned at Area 2 while Bradford was in custody. According to Butler's affidavit, when Butler attempted to speak to his uncle while passing the room where he thought he was being held, Bradford did not answer, and Detective Otto said "he can't hear you now, ha!ha!ha!ha! He's all f—ked up!" *See* R. 219-1 ¶ 25. Butler goes on to attest to his belief that "[s]omeone killed" Bradford "or was instrumental in having or watching it be done." *Id.* ¶ 34. But other than Butler's speculation, there is no record evidence that was the case. To the contrary, both doctors who performed autopsies and Plaintiffs' own expert concluded that Bradford's death was a suicide by hanging and cited no contributing causes or found any outward signs of trauma.[7] *See* R. 23, Ex. H at 1-5, 9; R. 199, Ex. U at 47; R. 199, Ex. Z at 50, 53. Moreover, not only is it unclear that Bradford was in the room at the time such that he could respond to Butler, but also Butler's affidavit on this point is inconsistent

---

[7] Plaintiffs also represent that Bradford "had marks on his arms" that "were consistent with torture," citing only to "Autopsy." R. 217 ¶ 15. But there is nothing in any autopsy report to support that fact. Instead, the photos from lockup show that Bradford's arms were intact while there, and the medical examiner testified that the incisions to Bradford's wrists in later photographs were not present prior to the autopsy. *See* R. 23, Ex. I at 103-04.

15

with his October 2014 deposition testimony in any case.[8] *See* R. 224, Ex. AB at 84, 86, 91, 92 (indicating on several occasions that Otto had stated that Bradford "was f—ked," and that Butler was not sure Bradford was in the room when he did not respond to Butler's inquiry); *see also McCann,* 622 F.3d at 750-51 ("a plaintiff cannot manufacture an issue of fact by submitting an affidavit that contradicts prior sworn testimony").

Summary judgment is proper for Otto on Plaintiffs' medical care claim.

***Gill.*** Next, Plaintiffs contend that Gill is liable on the medical care claim because she was in charge of lockup the evening of Bradford's death and was "personally responsible for the personnel at District 5" and "for the wellbeing of the detainees." R. 220 at 19. But "to recover damages against a prison official acting in a supervisory role, a § 1983 plaintiff . . . must . . . [demonstrate] that the defendant, *through his or her own conduct*, has violated the Constitution." *Perez v. Fenoglio*, 792 F.3d 768, 781 (7th Cir. 2015) (emphasis added). Plaintiffs have not done so.

Plaintiffs contend that Gill knew "that Bradford was a high profile case placed in a cell where she was unable to see him and the cameras were broken." R. 220 at 18. And Plaintiffs posit that Gill prepared a report in the aftermath of Bradford's death indicating that once Bradford had been charged, he should have been made to change into paper clothing. *Id.* at 19. Plaintiffs speculate that "[s]ince [Gill] wrote

---

[8] Notably, Butler's affidavit indicates that when Butler had been able to speak to Bradford earlier that day, Butler asked Bradford through the door, "You alright?", and Bradford responded, "Yeah." *See* R. 219 ¶ 13. The record does not contain any testimony from Otto regarding his exchanges with Butler.

this she must have been observing the changes in Bradford's demeanor after the charges went from robbery to murder and were given to him." *Id.* However, this report is not before the Court, and speculation about what Gill did or did not observe is not sufficient to survive summary judgment, even assuming there was evidence to substantiate a significant shift in Bradford's demeanor (which there is not). *Piotrowski v. Menard, Inc.*, 842 F.3d 1035, 1039 (7th Cir. 2016). Further, Plaintiffs cite no authority indicating that charging an arrestee with a serious crime places officers on notice that he may be suicidal, and the Court doubts that is the law. *See Walgren v. Heun*, 2019 WL 265094, at *4 (N.D. Ill. Jan. 17, 2019) ("[I]nferring notice based solely on the nature of the accusations against [the arrestee] suggests that notice could be imputed to any law enforcement officer who accuses an individual of committing a sex offense or potentially any other serious offense. The Court cannot accept that the scope of notice stretches so broadly."). And finally, as this Court has previously noted, a broken camera does not itself support a constitutional claim.[9]

Plaintiffs also argue that Gill failed to ensure that detectives did not interrogate arrestees in their cells, and that she failed to check on Bradford and the other individuals in lockup at least twice as City policy required. R. 220 at 19. But there is no evidence that Bradford was interrogated in his cell; in fact, the testimony is all to the contrary. And Plaintiffs fail to point to any evidence indicating that Gill

---

[9] *See* R. 72 at 7; *see also Brinson v. Williams*, 2009 WL 3483474, at *3 (S.D. Ga. Oct. 28, 2009) ("There is no constitutional requirement . . . that a prison warden install cameras to monitor every square inch of a prison"); *White v. Brown*, 2014 WL 1028650, at *7 (M.D. La. Mar. 14, 2014) ("there is no federal constitutional requirement that cameras be installed by prison officials in state prisons").

17

did not conduct her cell checks, and it is undisputed that West and Jones checked on Bradford every 15 minutes.[10] Summary judgment is proper for Gill.

**West.** Plaintiffs also argue that Detention Aide West is liable because he "knew that Bradford had been charged with murder." R. 220 at 20-21. But as stated, the fact of Bradford's charge was insufficient to place West on notice of Bradford's suicidal ideations. Plaintiffs also contend that West is personally responsible because he "did not stop and check to see if Bradford was dead or alive" during his rounds or "determine if [Bradford] was ok or about to commit suicide." *Id.* And Plaintiffs suggest that West "could have moved [Bradford] closer to the desk sergeant where he could be monitored and did not." *Id.* But it is undisputed that West and Jones performed cell checks every 15 minutes, and, lacking notice of Bradford's suicidal ideations, Plaintiffs fail to establish that more was required.[11] Summary judgment is proper for West on Plaintiffs' medical care claim.

### 2. Conditions of confinement

An arrestee claiming that the conditions of his confinement are unconstitutional must show that "the totality of the defendant's conduct in detaining the arrestee was 'objectively unreasonable' under the circumstances." *Flores v. Lackage*, 938 F. Supp. 2d 759, 775 (N.D. Ill. 2013); *Williams,* 509 F.3d at 403. In

---

[10] In any event, "a violation of a jail policy is not a constitutional violation enforceable under 42 U.S.C. § 1983." *Pulera*, 966 F.3d at 551.

[11] Moreover, it is undisputed that West (and Jones) acted promptly and appropriately when they discovered Bradford hanging. *See Woods v. City of Chicago*, 2016 WL 11702225, at *4 (N.D. Ill. Dec. 23, 2016) (indicating that the actions by law enforcement "taken to revive or treat" the arrestee "in response to finding [his] body hanging in a cell may be the genuine issue in a case").

making that assessment, courts consider several factors, including: the duration of confinement; the nature and seriousness of the alleged constitutional violation; and the police rationale for the alleged deprivation of rights. *Flores*, 938 F. Supp. 2d at 775; *see also Lopez,* 464 F.3d at 720. Unlike a medical care claim, a conditions of confinement claim does not require that the defendant have notice of the arrestee's medical need. *Saucedo*, 2015 WL 3643417, at *6. Instead, "notice is merely one, non-conclusive factor" in the analysis. *Id.* But in suicide cases, that notice remains instructive. And that makes sense, because as the court observed in *Alcorn v. City of Chicago*, "it is difficult to see how failure to closely observe [the arrestee] or failure to remove [clothing] items . . . from his person would be 'objectively unreasonable' unless the Defendants were on notice that [he] had a medical condition for which unmonitored time alone or access to [his] own clothing could pose a risk to his safety." 2018 WL 3614010, at *13 (N.D. Ill. July 27, 2018). The court in *Alcorn* went on to dismiss the plaintiff's conditions of confinement claim, concluding that even the defendant-officers' alleged failure to perform the required 15-minute cell checks was not objectively unreasonable where the officers lacked notice of suicidality. *Id.*

As in *Alcorn*, the Individual Defendants lacked notice of Bradford's suicidal ideations. And while it is undisputed that there were no working cameras in Bradford's cell and that Bradford was not provided with paper clothing and apparently retained his pajama pants, it likewise is undisputed that the required 15-minute cell checks were performed. And as noted, a broken camera does not itself support a constitutional claim. Bradford also was offered food, drink, and cigarettes

and to use the restroom on multiple occasions while in Area 2, and the ERI recordings reflect that he was treated in a civil manner.

Finally, Plaintiffs make much of the fact that another arrestee committed suicide a few days after Bradford did. But that has no bearing on whether the Individual Defendants acted in an objectively unreasonable manner with respect to Bradford. Plaintiffs' conditions of confinement claim fails on these facts. *Cf. Alcorn*, 2018 WL 3614010, at *13 (dismissing conditions of confinement claim notwithstanding that defendants failed to perform 15-minute cell checks or remove harmful clothing from arrestee's person, and ignored banging from arrestee's cell, because plaintiff alleged no facts to indicate that defendants were aware that arrestee was suicidal); *Saucedo*, 2015 WL 3643417, at *6 ("a reasonable jury exercising common sense could . . . conclude that failing to restrain and monitor a detainee for over an hour after charging him with murder, despite ready access to handcuffs and surveillance video, is objectively unreasonable").

### B. Qualified Immunity

Defendants also contend that summary judgment is proper on Plaintiff's Fourth Amendment claim even if Plaintiffs could establish a genuine issue of fact for trial regarding liability, because qualified immunity shields the Individual Defendants. "When properly applied, [qualified immunity] protects all but the plainly incompetent or those who knowingly violate the law." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2085 (2011). Unlike most defenses, "[t]he plaintiff carries the burden of defeating the qualified immunity defense" once raised. *Chasensky v. Walker*, 740 F.3d

1088, 1095 (7th Cir. 2014). Qualified immunity applies unless the plaintiff establishes both that: (1) the facts, taken in the light most favorable to the plaintiff, amount to a constitutional violation; and (2) the constitutional right at issue was "clearly established" at the time of the alleged violation. *McComas v. Brickley,* 673 F.3d 722, 725 (7th Cir. 2012). A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). To demonstrate that's the case, a plaintiff must present either: (1) a closely analogous case establishing the unconstitutionality of the defendant's conduct; or (2) evidence that such conduct was "so patently violative of the constitutional right that reasonable officials would know without guidance from a court." *Estate of Escobedo v. Bender,* 600 F.3d 770, 779-80 (7th Cir. 2010).

Defendants point to the Supreme Court's decision in *Taylor v. Barkes* to argue that there is no constitutional right to the implementation of adequate suicide prevention protocols for pretrial detainees, and no clearly established right to suicide screening or monitoring. *See* R. 199 at 21-22 (citing *Taylor v. Barkes*, 135 S. Ct. 2042 (2015) and *Saucedo*, 2015 WL 3643417, at \*22-23). Plaintiffs respond only by offering *Calallieri v. Shepard*, 321 F.3d 616 (7th Cir. 2003), in which the court "denied qualified immunity to a police officer who failed to report to jail personnel a detainee's risk of suicide." R. 220 at 23. But Plaintiffs' analysis goes no further than that, and *Calallieri* is easily distinguished, because there, the plaintiff had established a genuine issue regarding the defendant-officer's notice of the risk of suicide, and here, Plaintiffs have not. 321 F.3d at 623. Plaintiffs have failed to meet their burden to

establish a genuine issue for trial concerning qualified immunity, and summary judgment is proper for the Individual Defendants on Count III.

## II.     Illinois Wrongful Death and Right of Survivorship (Counts I and II)

Defendants claim that summary judgment is also proper for the Individual Defendants on Plaintiffs' claims against them under Illinois's Wrongful Death and Survival Acts, because they have immunity under the Illinois Tort Immunity Act ("TIA"). Plaintiffs fail to meaningfully respond to Defendants' argument.[12] Regarding medical care, the TIA provides in relevant part that:

> Neither a public entity nor a public employee is liable for injury proximately caused by the failure of the employee to furnish or obtain medical care for a prisoner in his custody; but this Section shall not apply where the employee, acting within the scope of his employment, *knows from his observation of conditions that the prisoner is in need of immediate medical care* and, through willful and wanton conduct, fails to take reasonable action to summon medical care. Nothing in this Section requires the periodic inspection of prisoners.

745 ILCS 10/4-105 (emphasis added). Having determined that the Individual Defendants were *not* aware of the need for care, Plaintiffs' wrongful death and survival action claims based on that theory necessarily fail. *See Belbachir v. Cty. of McHenry*, 2012 WL 4595344, at *7 (N.D. Ill. Sept. 28, 2012) ("None of the individual

---

[12] Instead, Plaintiffs confusingly blend their argument regarding the TIA with their argument on qualified immunity. *See* R. 220 at 23-24 (stating "The Tort Immunity Act holds that even if there is liability, the officers of a municipality are shielded from liability through qualified immunity (745 ILCS 10/1-101)." But the two doctrines apply to different claims. *See Jain v. Bd. of Educ. of Butler Sch. Dist. 53*, 366 F. Supp. 3d 1014, 1019 (N.D. Ill. 2019) ("It does not appear that qualified immunity for federal claims extends to state-law claims under Illinois law, in any event."); *see also Collins v. Bd. of Educ. of N. Chicago Cmty. Unit Sch. Dist. 187*, 792 F. Supp. 2d 992, 999 (N.D. Ill. 2011) ("The Tort Immunity Act applies only to tort actions and does not bar actions for constitutional violations.").

defendants were shown to have been subjectively aware she was at substantial risk of suicide. Accordingly, they are entitled to summary judgment [under the Tort Immunity Act] on these state law claims.").

Plaintiffs' state law claims also fail to the extent they rely on an alleged failure to supervise Bradford, because the TIA provides absolute immunity to the Individual Defendants with respect to those claims. *See* 745 ILCS 10/4-103 ("Neither a local public entity nor a public employee is liable for failure to provide a jail, detention or correctional facility, or if such facility is provided, for failure to provide sufficient equipment, personnel, supervision or facilities therein."); *Jefferson v. Sheahan*, 664 N.E.2d 212, 217 (Ill. App. Ct. 1996) ("the legislature did not intend there to be an exception for willful and wanton misconduct in section 4-103, and none may be judicially created"). Accordingly, summary judgment is proper for the Individual Defendants on Counts I and II.

## III. *Respondeat Superior* and Indemnification (Counts V and VI)

Defendants argue that Counts V and VI against the City for *respondeat superior* and indemnification must fail because the underlying claims against the Individual Defendants do. In response, Plaintiffs argue that the underlying claims survive summary judgment, and therefore so to should the *respondeat superior* and indemnification claims as to the City. *See* R. 220 at 25. But the Court has concluded that the claims against the Individual Defendants fail, so summary judgment is also proper on Counts V and VI. *See Finwall v. City of Chicago*, 490 F. Supp. 2d 918, 927 (N.D. Ill. 2007) ("Because the underlying claims against the individual defendants

23

have been dismissed, the respondeat superior claim against the City must also be dismissed") (citing *Bachenski v. Malnati*, 11 F.3d 1371, 1377-78 (7th Cir. 1993)); *see also Warfield v. City of Chicago*, 565 F. Supp. 2d 948, 968 (N.D. Ill. 2008) ("To the extent that the Court has dismissed claims against the individual Defendants, Plaintiffs' indemnification claims are also dismissed.").

## IV.  *Monell* **(Count IV)**

Plaintiffs' *Monell* claim, which as noted was previously bifurcated from the claims against the Individual Defendants, alleges that the City's ongoing failure to repair camera equipment installed to ensure inmate safety and systematic understaffing and failure to supervise at-risk arrestees in City lockups created constitutionally unreasonable conditions of confinement for inmates at risk of suicide. But having determined that Plaintiffs have not established a constitutional violation related to Bradford's supervision, Plaintiffs' *Monell* claim fails.[13]

### Conclusion

The Court acknowledges the unfortunate nature of the events in this case and empathizes with Bradford's family over the loss of Bradford's life. But even construing the facts and all reasonable inferences in Plaintiffs' favor, there is no evidence to support that those events are legally attributable to Defendants' actions (or inaction). Accordingly, Defendants' motion for summary judgment is granted in full, R. 198, and this civil case is terminated.

---

[13] Defendants also seek summary judgment on Plaintiffs' claim to recover the costs of Bradford's funeral. But having concluded that Defendants are not liable for Bradford's death, the Court need not reach the merits of this issue.

ENTERED:

_____
Honorable Thomas M. Durkin
United States District Judge

Dated: March 31, 2021